STATE OF NEBRASKA, APPELLEE, V.
LORELE LESOING-DITTOE, APPELLANT.
STATE OF NEBRASKA, APPELLEE, V.
DOUG DITTOE, APPELLANT.

693 N.W.2d 261

Filed February 18, 2005. Nos. S-03-1004, S-03-1005.

Mark A. Fahleson and Glen Th. Parks, of Rembolt, Ludtke & Berger, L.L.P., for appellants.

Jon Bruning, Attorney General, Kimberly A. Klein, Gary E. Lacey, Lancaster County Attorney, Alicia B. Henderson, and Jarrod P. Crouse, Senior Certified Law Student, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## NATURE OF CASE

The Lancaster County Court ordered that a dog owned by Lorele Lesoing-Dittoe and Doug Dittoe (collectively the Dittoes) be destroyed. The Lancaster County District Court affirmed the judgment of the county court, and the Dittoes appeal.

## SCOPE OF REVIEW

■ In an appeal of a criminal case from the county court, the district court acts as an intermediate court of appeal, and as such, its review is limited to an examination of the county court record for error or abuse of discretion. *State v. Jensen, ante* p. 213, 691 N.W.2d 139 (2005).

■ Both the district court and the Nebraska Supreme Court generally review appeals from the county court for error appearing on the record. *Id.*

■ When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *In re Guardianship &*

*Conservatorship of Trobough,* 267 Neb. 661, 676 N.W.2d 364 (2004).

## FACTS

The Dittoes live on an acreage near Lincoln, Nebraska. They own a female malamute-shepherd mix dog named "Murphy." During 1996, Murphy left the Dittoes' yard on four separate occasions and attacked or injured other dogs in the nearby area.

The Dittoes took a number of steps to confine and train Murphy in order to prevent further incidents. Because Murphy was able to jump over a small fence that surrounded the Dittoes' backyard, they installed an invisible fence, but the system did not function properly and Murphy was shocked repeatedly. This system was removed, and in March 1997, the Dittoes installed a 6-foot-high three-rail iron fence at a cost of $20,000. Murphy was not involved in any further incidents until 2001.

On March 17, 2001, Doug inadvertently left a gate open. Murphy and another dog owned by the Dittoes ran at large while the Dittoes were out for the evening, and Murphy attacked a dog owned by John Matejovich. Matejovich stated that he heard yelping after he let his dog out onto the patio. He found Murphy holding his dog by the back of the neck. Matejovich separated the dogs and took his dog into the house. Matejovich's dog had a wound on the side of its neck, and 2 days later, he took the dog to the veterinarian. No stitches were required, and the veterinary bill was $34.06.

On March 19, 2001, the Dittoes were notified by the Lancaster County sheriff's office that Murphy had been declared a potentially dangerous dog pursuant to Neb. Rev. Stat. § 54-617(6) (Reissue 2004). A complaint was filed against Doug on March 22, alleging that Murphy had been allowed to run at large in violation of Neb. Rev. Stat. § 54-608 (Reissue 2004). A complaint was filed against Lorele on March 27, alleging that Murphy and a dog named "Chloe" had "wounded, injured, worried or chased" a domestic animal belonging to John or Beverly Matejovich. See Neb. Rev. Stat. § 54-601 (Reissue 2004). The Dittoes pleaded no contest to the charges.

On April 6, 2001, the State filed a motion for disposition of Murphy pursuant to Neb. Rev. Stat. § 54-611 (Reissue 2004). The

motion alleged that the "reasonable and proper" disposition was the destruction of Murphy. See *id.*

At a proceeding characterized by the State as a "sentencing hearing," Lorele testified that after the March 2001 incident, they added spring-loaded gates and padlocks to the fence and that there had been no further incidents of Murphy's leaving the yard. She stated that the Dittoes had set up fencing systems, taken Murphy to obedience school, and socialized her by visiting dog runs and by inviting other animals to their home. Lorele noted that Murphy was currently being supervised whenever she was in the backyard and that she had never exhibited any threatening behavior toward children or adults in the Dittoe home.

Doug testified that on March 17, 2001, he took Murphy and Chloe for a walk. When he returned, he forgot to close one gate, and the dogs got out while the Dittoes were away for the evening. Doug stated that the Dittoes had taken several steps to ensure that no future incidents would occur, including installing spring-loaded hinges on both fence gates, installing padlocks on the gates, and posting signs instructing that the gates must remain closed at all times. Doug did not believe that Murphy was a dangerous dog or that she needed to be destroyed.

Dr. Valerie Aliano, Murphy's veterinarian since 1995, testified that she had treated at least 10,000 animals over the course of 18 years of practice. Aliano stated that Murphy had never caused any trouble with other dogs while she was at Aliano's clinic. Murphy did not react aggressively even when invasive procedures were performed. Based on her training and experience, it was Aliano's opinion that Murphy was not a threat to other animals and that she should not be destroyed.

Lancaster County Sheriff Terry Wagner testified that he had personally spent time with Murphy and observed the steps that the Dittoes had taken to confine her. Based on his information and experience, Wagner agreed with Aliano's opinion that it would be unreasonable to destroy Murphy.

Six other individuals testified as to Murphy's nature and the steps taken by the Dittoes to contain her within the confines of their property. These witnesses had personally observed and spent time with Murphy, and in some instances, their children and pets had spent time with Murphy as well. Each witness testified based

on personal experience that destruction of Murphy was not reasonable or proper.

The county court found that the 1996 attacks appeared to be unprovoked and that in at least two of the cases, it appeared that Murphy was "stalking" the other dogs. The court opined that if Murphy got loose, she would be a threat to any dog, and that although the Dittoes had spent considerable money to erect and maintain a fence, they could not guarantee that Murphy would not get loose again. The court ordered that Murphy be confiscated by the Lancaster County sheriff's office, which acts as the animal control authority for the county, and that Murphy be destroyed in an expeditious and humane manner within 30 days of the order if no appeal was filed. In addition, Lorele and Doug were each fined $100 plus costs, and they were ordered to pay the Matejoviches' veterinary bill of $34.06.

The Dittoes appealed to the Lancaster County District Court, which ordered that Murphy remain in the custody of the Dittoes during the pendency of the appeal. The district court found no error on the record of the county court. It noted that the question was not whether the district court would have ordered Murphy's destruction, but whether the county court abused its discretion. It found no abuse of discretion, and it affirmed the judgment of the county court. The Dittoes timely appealed from that order.

## ASSIGNMENT OF ERROR

The Dittoes make a number of assignments of error. However, we address only one because it is dispositive of this appeal: The district court erred when it found no error in the county court's conclusion that the destruction of Murphy was "reasonable and proper."

## ANALYSIS

Section 54-611 provides:

> In counties having a population of eighty thousand or more inhabitants and cities of the first class contained in such counties, if upon final hearing the defendant is adjudged guilty of any violation of sections 54-601 and 54-608 to 54-610, the court may, in addition to the penalty provided in section 54-613, order such disposition of the offending dog as may seem reasonable and proper.

The issue is whether the destruction of Murphy was a reasonable and proper disposition.

In an appeal of a criminal case from the county court, the district court acts as an intermediate court of appeal, and as such, its review is limited to an examination of the county court record for error or abuse of discretion. *State v. Jensen, ante* p. 213, 691 N.W.2d 139 (2005). Both the district court and the Nebraska Supreme Court generally review appeals from the county court for error appearing on the record. *Id.* When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *In re Guardianship & Conservatorship of Trobough*, 267 Neb. 661, 676 N.W.2d 364 (2004).

■ However, because the dispositional order in this case is more akin to a sentence, our review is for abuse of discretion. See *State v. Weaver*, 267 Neb. 826, 677 N.W.2d 502 (2004). A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition. *State v. Hall*, 268 Neb. 91, 679 N.W.2d 760 (2004).

Upon a finding that the Dittoes were guilty of violating §§ 54-601 and 54-608, the county court was allowed to order "such disposition of the offending dog as may seem reasonable and proper." See § 54-611. The provision in § 54-611 that allows the court to order disposition is similar to Neb. Rev. Stat. § 29-2280 (Reissue 1995), which allows a court to order restitution to the victim of a crime. In that situation, restitution is " 'a criminal penalty imposed as punishment for a crime and is part of the criminal sentence imposed by the sentencing court.' " *State v. Holecek*, 260 Neb. 976, 981, 621 N.W.2d 100, 104 (2000). Therefore, we consider whether the county court abused its discretion when it ordered the destruction of Murphy.

In 1996, Murphy was involved in four separate incidents during which she attacked other dogs. No other incidents occurred until March 2001, when Murphy was inadvertently allowed to run at large. The incident resulted in what appears to be a relatively minor injury, in that the owner of the other dog waited 2

days to have the dog seen by a veterinarian and the bill for treatment was $34.06.

At the "sentencing hearing," no evidence was offered that Murphy has ever attacked or harmed a human. One owner of a dog that had been injured by Murphy 5 years earlier stated in an affidavit that Murphy should be destroyed, and two other dog owners testified to holding the same opinion.

Aliano, the veterinarian who had treated Murphy since 1995, testified based on her experience, education, and knowledge of dog behaviors that Murphy was an alpha dog, which is a dog that tries to assert dominance over other animals. If an animal submits, Murphy will not take any other action because "all she is trying to do is say, 'I'm top dog in this situation.'" Aliano said that the injuries inflicted by Murphy were consistent with an alpha dog type of confrontation. Aliano said that an alpha dog could be aggressive toward other dogs and yet pose no threat to humans. She stated that Murphy was not a threat to people. Aliano said Murphy's interaction with other dogs in the waiting room of the veterinary clinic had been appropriate, had been well controlled, and did not show any kind of aggression toward other animals. Aliano said she has never had to have a veterinary technician assist her to control Murphy, to use a muzzle on Murphy, or to have Murphy wait in an examination room rather than the waiting room.

Aliano, who had been a veterinarian for 18 years, opined that the Dittoes had "gone above and beyond what most people would do to correct the situation to make sure" that Murphy did not harm another dog. In her 18 years of practice, Aliano had seen a number of animals that were aggressive, but she had never had a problem with Murphy. She had on occasion recommended euthanasia for certain animals because of behavior problems and was not opposed to euthanasia because there were times that it was necessary. Because of the proper precautions that the Dittoes had taken, she believed that Murphy was not a threat. In Aliano's opinion, Murphy was not a dog that was going to go after any animal because it was prey. Murphy was less dangerous than many of the dogs Aliano treated. When asked for her opinion based upon her training and her personal observations of Murphy, Aliano replied that she "absolutely [did] not believe that [Murphy] needs to be destroyed."

The Lancaster County sheriff's office acts as the animal control authority for the county. Wagner, the Lancaster County sheriff, testified that he was familiar with dangerous dog situations. Wagner stated that he knew Doug from high school and had visited the Dittoe home on social occasions. Wagner was familiar with Murphy's past history, but he had never seen Murphy behave aggressively and did not consider her to be dangerous.

Wagner had observed the fence around the backyard of the Dittoe residence and described it as "[p]retty massive," "real substantial," and "it does a good job of containing the backyard." Wagner said the steps taken by the Dittoes were reasonable to confine a potentially dangerous dog. Based on his training and experience in law enforcement and on his personal observation of Murphy, Wagner did not believe a proper disposition would be to destroy Murphy.

Linda Vavrus, who worked as a gardener for the Dittoes, testified that Murphy and Chloe were very friendly dogs. The dogs greeted Vavrus and her employees at the gate and then watched the gardeners as they worked. Vavrus said none of her crew had ever been bothered by the dogs, and she had never witnessed any violent behavior on the part of either of the dogs. Vavrus said that she did not consider either Murphy or Chloe to be a dangerous dog and that neither should be destroyed.

A number of relatives and friends of the Dittoes testified that Murphy had not posed a threat to their children and other dogs. Cindy Rempe testified that her children have taken care of the Dittoes' dogs and stayed with them when no adult is present, including over weekends. She had never seen Murphy act aggressively toward her children, other humans, or other animals. Rempe said she did not believe Murphy was a dangerous dog and did not believe that she should be destroyed.

Lorele's sister, Jennifer Lesoing-Lucs, had a dog that played with Murphy. Lesoing-Lucs said her dog had never been injured as a result of playing with Murphy. Her opinion was that Murphy should not be destroyed because she was not a threat.

Donna Carlsen, Doug's sister, testified that she visited the Dittoes with her dog. Carlsen said she had never observed any acts of aggression or injury by Murphy or Chloe. Carlsen's children also play with Murphy, and there have been no aggressive

incidents toward her children. Carlsen said she did not believe Murphy should be destroyed.

Becki Seoane, a friend of the Dittoes, testified that her children and their friends have played with Murphy on a regular basis and that she had never observed or had reported to her any act of aggression by Murphy toward a child. Seoane did not consider Murphy to be a dangerous animal or an aggressive dog, and she did not believe Murphy should be destroyed.

Laird Haberlan, a friend of the Dittoes, said his 6-year-old son played with Murphy. Haberlan has no concern for his son's safety around Murphy, and he had never seen Murphy act aggressively toward his son, other people, or other animals. He did not believe Murphy should be destroyed.

Although there were some recommendations for Murphy's destruction from the owners of the dogs that had been attacked, neither Wagner nor Aliano agreed with those recommendations. Thus, the two expert witnesses who had personally observed Murphy's behavior and the location in which she was confined did not believe that it would be proper to destroy her. These individuals had previously dealt with aggressive animal situations during their professional careers and did not believe the dog should be destroyed.

It is apparent from the record that the Dittoes have gone to extraordinary measures to prevent the reoccurrence of the dog's escape. They have constructed a 6-foot-high iron rail fence at a cost of $20,000. The gate which allowed the dog to escape is now spring loaded and locked. It is also significant that Wagner testified that the fence was substantial and did a good job of containing the dogs. Wagner, as a government official responsible for enforcing the statutes governing dogs, opined that Murphy's destruction was not a proper disposition.

Pursuant to § 54-611, the county court may order such disposition of an offending dog as may seem reasonable and proper. Whether such disposition is reasonable is dependent upon the particular circumstances. Under the facts and circumstances of this case, we conclude that the order for the destruction of the dog was not reasonable. The county court therefore abused its discretion in ordering the destruction of the dog.

## CONCLUSION

The judgments of the district court, which affirmed the combined judgment of the county court, are reversed, and the causes are remanded with directions that the district court shall enter orders reversing the judgment of the county court that ordered destruction of the dog named "Murphy."

REVERSED AND REMANDED WITH DIRECTIONS.